UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA                         CASE NO. 9:18-CV-81276

    Plaintiff,

vs.

DANIELA DADURIAN,

    Defendant.
_____/

## MOTION FOR PARTIAL SUMMARY JUDGMENT

    Defendant Daniela Dadurian files this Motion for Partial Summary Judgment under Federal Rule of Civil Procedure 56(a). The Government has sued for penalties for Defendant's alleged willful failure to file FBAR forms disclosing certain foreign accounts for the tax years 2007, 2008, 2009, and 2010. Defendant moves for summary judgment in her favor as to the penalties that pertain to Tax Years 2007 and 2010.

    Briefly summarized (and necessarily simplified), Defendant's argument is that no genuine issue exists concerning the following material facts. With respect to Tax Year 2007, Defendant Dadurian did not know, and could not reasonably be expected to know, that certain of the undisclosed accounts existed. And with respect to Tax Year 2010, Defendant Dadurian fully disclosed the existence of the accounts to qualified tax professionals (including a highly regarded CPA and a prominent national law firm), who advised her that she did not have to report the accounts at issue. Accordingly, Defendant's failure to disclose the accounts during Tax Years 2007 and 2010 was not willful, so as to justify penalties under 31 U.S.C. § 5321(a).

1

# INTRODUCTION AND IMPORTANT BACKGROUND[1]

The Government seeks willful FBAR penalties against the Defendant. Accordingly, the key issue in this Motion is Defendant's willfulness—what Dadurian knew[2] about the accounts identified in paragraphs 10 through 13 of the Government's Complaint [DE 1], and her about her obligations to report these accounts at the time each individual FBAR form became due on June 30th of the following year.

## I. Daniela's early life, her father's trusts, and her relationship with her parents.

Daniela Dadurian was born in Romania in 1965. She is an only child and has no close familial relationships behond her parents. She and her parents emigrated as political refugees to Germany when Daniela was a small child. The family had abandoned their assets in Romania and had nothing when they arrived. Eventually, Daniela's father Aram established a successful medical practice. Around 1977, when the Daniela was in her early teens, her family sent her to school in England. She attended school as a boarder. From this point on, Daniela would never share a permanent residence with her parents. After graduating from secondary school (high school, essentially) in England, Daniela moved to the United States to attend the University of Miami. She would continue at the University of Miami afterwards, obtaining a medical degree from University of Miami's medical school. She did here residency in internal medicine at Jackson Memorial Hospital until 1997. She has remained in South Florida ever since.

---

[1] The facts contained in this section are background matter and not strictly "material" for the purposes of a summary judgment motion. Defendant Dadurian testified to them, generally, at her deposition. And her attached Declaration states that she has reviewed the Motion and that to the best of her knowledge the factual representations it makes are true.

[2] Or, possibly, should have known. See, infra, section entitled "Standard Governing Willfull FBAR Violations," subsection entitled "The Willfulness Standard."

At least until Daniela finished her residency, Aram provided for and managed his daughter Daniela's finances, including her tax reporting obligations. He paid her tuition. He paid her rent. And he provided her living expenses.

Unbeknownst to Daniela at the time, Aram also made long-term plans for Georgeta's financial security. Around 1987, Aram and Georgeta would establish Stiftung Lionette, a Lichtenstein foundation, with Georgeta as the beneficiary. Later, Aram would set up Shoremont Resources, Ltd. in the British Virgin Islands. With respect to both Stiftun Lionette and Shoremont Resources, Georgeta was listed as the beneficiary. Upon Georgeta's death, Daniela would become the entities' beneficiary. Again, neither Aram nor Georgeta told Daniela about this arrangement. And as a medical student and young doctor, Daniela did not have significant time to involve herself in her parents' financial planning. **[SOMF ¶ 1–2.]**

In the late 1990s, Daniela's parents moved from Germany to the Caribbean nation of St. Kitts. Georgeta did not like living in St. Kitts, however, and soon thereafter moved from St. Kitts to West Palm Beach to live near Daniela.

At this point, Georgeta and Aram's health began to decline. In 2000, Aram was diagnosed with terminal lung cancer. He died in 2001 without ever telling Daniela about Stiftung Lionette or Shoremont Resources. **[SOMF ¶ 1–2.]** His will had been drafted in 1975 and it left all his property to Georgeta. Obviously, it did not mention Stiftung Lionette or Shoremont, as they did not exist at the time. In preparation for his death, unbeknownst to Daniela, Aram named a close friend and confidant in St. Kitts—Janet Brookes—as trustee of Stiftung Lionette and Shoremont Resources. He instructed Janet to (1) administer the assets for the benefit of Georgeta during her life, and for Daniela after Georgeta died; (2) to loan money to Daniela at her discretion; and (3) to keep the

3

entities confidential with respect to Daniela. Aram did, however, inform Daniela that she could ask Janet to lend her money if she ever had the need.

Georgeta remains alive to this day, but she has declined mentally. She was diagnosed with Alzheimer's disease in or around 2003. In retrospect, Daniela recognizes that Georgeta exhibited symptoms of the disease as early as 2001. Possibly for this reason, Georgeta likewise never disclosed the existence of Shoremont Resources Ltd. or Stiftung Lionette to Daniela. **[SOMF ¶ 1–2.]**

Due to her mother's Alzheimer's Disease, Daniela obtained power of attorney over her mother in or around 2003. This power of attorney caused Daneila to have signatory authority over the Shoremont and Stiftung Lionette accounts, and accordingly resulted in an obligation to report them on FBAR forms. She failed to do so, however, because she simply did not know that the accounts existed. **[SOMF ¶ 1–2.]**

## II.   Daniela's Loan from Janet through Ayaba

In or around 2006, Daniela engaged in the preconstruction purchase of new office space for her medical practice. She knew that she would require additional funds for the closing, and—consistent with her father's instructions—she approached Janet for a loan. Janet informed Daniela that she was interested in starting to invest in medical practices, that she would create a company for that purpose, and that Daniela would be her first borrower.

Consistent with this arrangement, on or about September 18, 2007, Janet presented Daniela with a promissory note and loan agreement. Daniela signed both of these documents, which permitted Daniela to obtain advances as needed against a line of credit up to $2,500,000.

Closing on the office space was delayed. Accordingly, Daniela did not actually require funds from the loan until late 2008. At this point, Daniela again approached Janet to request the

advance per the loan terms. In advance of and in connection with making the disbursement, Janet presented Daniela with a stack of documents and had her sign and initial them. Daniela did so without reading them, because Daniela appreciated the trust that her father had placed in Janet and believed that Janet would not have her sign documents that were against her interest.

Had Daniela reviewed these documents, she would have learned that that they described the trust structure at issue in this case and authorized the transfer of funds from Shoremont and Stiftung Lionette to Ayaba, so that Ayaba could then lend this money to Daniela. Regardless, Daniela signed the documents. Ayaba made payment not to Daniela, but directly to Bilzen Sumberg, the closing agent for the office space.

### III. Daniela's Discovery of the Accounts and Disclosure to Tax Advisors

Daniela first became aware of the structures and accounts at issue in this case during the audit that led to this action. **[SOMF ¶ 1–2.]** This audit began in May 2010, with an interview of Daniela at her office. Over the ensuing months, the IRS made a series of document requests to the entities and the banks that held their accounts.

It was through the documents produced in response to these requests that Daniela learned of the existence of Shoremont and Stiftung Lionette, and that her father had funded these two entities. It was also through these document requests that Daniela learned that Shoremont and Stiftung Lionette's money had been used to fund the loan she obtained from Ayaba. **[SOMF ¶ 1–2.]**

While this was all unfolding, Daniela retained the services of Akerman LLP, a prominent national law firm with a strong presence in South Florida. **[SOMF ¶ 3.]** She retained Akerman LLP on the recommendation of her CPA, who at the time was helping her with the audit. By March 31, 2011, Daniela had fully disclosed to her attorneys the entirety of her knowledge concerning

5

the foreign accounts at issue in this case, including those held by Ayaba, Stiftung Lionette, and Shoremont. **[SOMF ¶ 4.]** This disclosure is reflected in a March 31, 2011 letter from Akerman attorney Lesley Hogan to IRS Agent Amy Ishmael. [Exhibit B to the Dadurian Decl.] In that letter, Ms. Hogan describes the Daniela's relationship to the Ayaba and Shoremont accounts, and that Aram Dadurian was the ultimate source of funds (through Shoremont) of the Ayaba loan. Ms. Hogan also observes that Daniela had power of attorney over Georgeta.

Nevertheless, Ms. Hogan concludes by stating that "[w]e believe it is clear that Daniela has no control over, nor ever had any control over, accounts title to Ayaba. Additionally, she possesses no beneficial interest in Ayaba while Georgeta is alive." This is consistent with advice that Daniela received from Akerman at the time and through June 30, 2011, when her 2010 FBAR would come due. **[SOMF ¶ 5.]** She was advised that she had neither a beneficial interest in the accounts nor control over the accounts, and therefore was not required to disclose them on an FBAR Form. **[SOMF ¶ 5.]**

Regrettably, this advice was not correct. By virtue of her Power of Attorney over Georgeta, Daniela had signature authority over Ayaba, Shoremont, and Stiftung Lionette's accounts. Eventually, Daniela changed counsel. In 2013, Daniela filed FBAR forms that properly disclosed her signature authority (as POA for Georgeta) over the accounts. These FBAR forms were accepted as accurate by the IRS examining agent, the penalties at issue in this case were proposed, and the administrative file was closed.

Nevertheless, Daniela reasonably relied upon Akerman's advice in failing to file her FBAR form for 2010, and accordingly lacked knowledge of her obligation to file the form for that year. **[SOMF ¶ 5–6.]**

6

## **SUMMARY JUDGMENT STANDARD**

As have many of the judges in the Southern District of Florida, Judge Rosenberg has adopted a consistent formulation of the standard applicable to summary judgment motions in this district that can be found throughout her orders. It is as follows:

> Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247–48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247–48).
>
> In deciding a summary judgment motion, the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*
>
> The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1342 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Calrett*, 477 U.S. 317, 322 (1986)).
>
> Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

*E.g.*, *Isaias v. Martin County*, Case No. 2:18-CV-14171, 2019 WL 1755438, at * 2 (S.D. Fla. Apr. 19, 2019) (Rosenberg, J.); *Salvador v. Brico, LLC*, Case No. 0:17-CV-61508, 2018 WL 1202823, at *1 (S.D. Fla., Mar. 8, 2018) (Rosenberg, J.).

## **STANDARD GOVERNING WILFULL FBAR VIOLATIONS**

### I.    **The FBAR Reporting Requirement**

The Government has sued Defendant for her alleged willful failure to disclose foreign accounts on a FinCen Form 114, more commonly known as an "FBAR" form. A United States person must file an FBAR Form with the internal revenue service on or before June 30th if they had either a financial interest in or signature authority over foreign financial accounts with an aggregate high balance greater than $10,000 at any point during the prior calendar year.

The filing of an FBAR form is required by regulations promulgated under the Currency Transactions and Foreign Reporting Act of 1970. The relevant provision of this Act, as amended, is codified at 31 U.S.C. § 5314(a):

> Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States . . . to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction ***or maintains a relation for any person with a foreign agency***.

(emphasis added). Pursuant to this statutory command, the Secretary of the Treasury has set forth the FBAR filing requirements at 31 C.F.R. § 1010.350(a). They read—

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of the Internal Revenue for each year in which such relationship exists and shall provide such information [on an FBAR Form].

And per 31 C.F.R. § 1010.306(c), "Reports required to be filed by § 1010.350 shall be filed with FinCEN on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."

## II.     Elements of a Claim for Willful Failure to File an FBAR Form

To prevail upon its claim that Defendant willfully failed to file an FBAR form, the United States must establish six elements by a preponderance of the evidence. "For a willful violation, the United States must show: (1) a U.S. person (2) with a financial interest or signatory or other authority (3) over a foreign financial account (4) that exceeds $10,000 in value (5) willfully (6) failed to file a timely FBAR disclosing the account." *United States v. Zwerner*, Case No. 13-22082-CIV, 2014 WL 11878430, at *2 (S.D. Fla. Apr. 29, 2014) (Altonaga, J.).

Upon making such a showing, the United States can recover a maximum penalty of $100,000 or half of the balance in the undisclosed account at the time of the violation, whichever is greater. *See id.* (citing 31 U.S.C. § 5321(a)(5)(C)–(D)).

## III.    The Willfulness Standard

For the purposes of this Motion, Defendant Dadurian does not challenge most of the elements of the Government's case. Rather, with respect to certain of the accounts in certain Tax Years, Defendant Dadurian contends that there is no evidence from which a reasonable factfinder could conclude that her failure to disclose was willful.

"Section 5321(a)(5) does not define how to assess whether an individual acted willfully in [her] failure to comply with the reporting requirements imposed by § 5314." *United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah 2012). Accordingly, Eleventh Circuit law on this standard therefore deserves some in-depth discussion.

9

There is controversy over whether willfulness in the FBAR penalty context "may be satisfied by establishing the individual's ***reckless disregard of a statutory duty***, as opposed to acts that are ***known to violate the statutory duty*** at issue." See *United States v. Zwerner*, Case No. 13-22082-CIV, 2014 WL 11878430, at *3 (S.D. Fla. Apr. 29, 2014) (Altonaga, J.) (emphasis added). In *Zwerner*, Judge Altonaga contrasted the Government's and Defendant's position on this open question but adopted neither view because summary judgment was inappropriate under either standard.

The undersigned has located only two other cases within the Eleventh Circuit that have directly addressed FBAR willfulness. Both have done so on a motion for default judgment. In *United States v. Badreg*, Case No. 6:17-cv-886, 2017 WL 4685252 (M.D. Fla. Sept. 28, 2017), United States Magistrate Judge Smith held that the government had adequately pleaded FBAR willfulness by alleging "that Defendant willfully attempted to evade the reporting requirement by failing to disclose the foreign account to his income tax preparer, instructing UBS to destroy his correspondence, and by transferring funds and closing the account instead of voluntarily reporting its existence as recommended by UBS." *Id.*, at *3. And in *United States v. Brandt*, Case No. 17-80671-CIV, 2018 WL 1121466 (S.D. Fla. Jan. 24, 2018), Judge Middlebrooks adopted the Government's position that "[w]illfulness does not require actual knowledge of the duty to report interest in a foreign account, but merely reckless or careless disregard of that statutory duty." *Id.*, at *4. In reaching this conclusion, *Brandt* relies on the Fourth Circuit's 2-1 unpublished decision in *United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012) and the District of Utah's decision in *United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012).

But *Brandt* fails to address highly persuasive contrary Eleventh Circuit authority. In *United States v. One (1) Lot of Twenty-Four Thousand Nine Hundred Dollars ($24,900.00) in U.S.*

*Currency*, 770 F.2d 1530 (11th Cir. 1985),[3] the Eleventh Circuit considered the mental state that the Government must prove to obtain forfeiture under another section of the Currency Transactions and Foreign Reporting Act of 1970 (the same statute that includes the FBAR rules) that governs the reporting of the exportation of United States currency. The Court held that civil forfeiture of the subject currency under 31 U.S.C. § 5317(b) requires a showing that a defendant "acted with knowledge of the currency reporting requirements." *Id.* at 1531.

The Eleventh Circuit based its conclusion on two observations. First, the Court observed that "[i]t is clear that the terms of a statute cannot have one meaning when a criminal prosecution is brought and another when a civil action is brought." *Id.* at 1533 (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)). Second, the Court conducted a thorough examination of the Act's legislative history. It observed that, "the purpose of the Act—obtaining reports—could only be achieved if [individuals] were made aware of the reporting requirements" and that allowing a penalty in the absence of a defendant's knowledge of the reporting requirements would only disincentivize the executive branches from actually publicizing the requirements. *Id.* at 1535. Further, the Court observed that "[t]he legislative history also indicates that Congress did not intend for the reporting requirements to damage international trade and commerce or in any way prevent money from moving freely into and out of the United States." *Id.* And failure to require knowledge of the reporting requirements would do just that. "A signal would be sent that United States law may well be filled with booby-traps that spring without warning to grab the currency of unsuspecting travelers." *Id.* at 1536. Similarly, with respect to the FBAR reporting requirements,

---

[3] Although this case is old by Eleventh Circuit standards, that enhances rather than diminishes its authority. *See In re Lambrix*, 776 F.3d 789, 793 (11th Cir. 2015) ("[U]nder this Court's prior-panel-precedent rule, a prior panel's holding is binding on all subsequent panels unless and until it overruled or undermined to the point of abrogation by the Supreme Court or by this Court sitting *en banc*.").

failure to require knowledge of those requirements would signal that such booby traps may exist that endanger the home-country bank accounts of foreign expatriates residing in the United States.

The Eleventh Circuit's *$24,900 of U.S. Currency* Decision concerns reporting requirements authorized at Section 5316 of the Act. The FBAR reporting requirements are authorized at Section 5314. Regardless, the Court's analysis applies with equal force, and this Court should hold that to prove an FBAR violation, the Government must show violation of known legal duty rather than mere recklessness.

As set forth in the following section, however, this Court should grant Defendant Dadurian's instant motion for partial summary judgment should under *either* a knowing or recklessness standard.

*[Continued on Next Page]*

## ANALYSIS

The Government seeks judgment on the FBAR penalties identified in a chart present at Paragraph 46 of its Complaint. The information in this chart is reproduced below, along with additional information about the account's holders drawn from Paragraphs 10–13 of the Complaint. Daniela asks for partial summary judgment in her favor and against the Government on the penalties shaded in gray, related to years 2007 and 2010.

| Year | Bank Name | Account Holder | Max. Account Balance | Penalty Amount Assessed. |
|---|---|---|---|---|
| 2007 | VP Bank (BVI) | Ayaba | $2,514,558.45 | $676,344.00 |
|  | VP Bank (BVI) | Shoremont | $2,096,518.63 | $100,000.00 |
|  | Frankfurter Bank | Daniela Dadurian | $356,875.60 | $35,682 |
|  | VP Bank | Stiftung Lionette | $294,616.13 | $29,462.00 |
|  | Sparkasse Bodensee | Georgeta Dadurian | $31,957.35 | $5,000 |
| 2008 | VP Bank (BVI) | Ayaba | $1,388,118.86 | $100,000.00 |
|  | VP Bank | Stiftung Lionette | $366,400.73 | $36,640.00 |
|  | Sparkasse Bodensee | Georgeta Dadurian | $20,333.34 | $5,000.00 |
| 2009 | Rahn & Bodmer | Ayaba | $1,317,936.00 | $637,062.00 |
|  | VP Bank (BVI) | Ayaba | $1,213,990.90 | $100,000.00 |
|  | Sparkasse Bodensee | Georgeta Dadurian | $18,000.00 | $5,000.00 |
| 2010 | Rahn & Bodmer | Ayaba | $1,384,186.00 | $656,682.00 |
|  | Sparkasee Bodensee | Georgeta Dadurian | $13,029.12 | $5,000.00 |

As set forth in this Motion's preceding section, to meet its burden with respect to these penalties, the Government must show by a preponderance of the evidence that Daniela knew that she had the obligation to file FBAR forms disclosing the corresponding account or, arguably, that she acted with reckless disregard of this obligation. *See See United States v. Zwerner*, Case No.

13-22082-CIV, 2014 WL 11878430, at *3 (S.D. Fla. Apr. 29, 2014) (Altonaga, J.). Summary Judgment should be granted with respect to each of the shaded penalties,[4] above, because no genuine issue of material fact exists as to this issue concerning these shaded penalties. This section will address these penalties in two groups. First, it will address the 2007 penalties. Next, it will address the 2010 penalties.

> **I.** **Summary Judgment should be granted in Defendant's favor with respect to the 2007 shaded penalties because it is undisputed that Dadurian had no knowledge of corresponding accounts before June 30, 2008, and had no reason to know of their existence.**

If a defendant neither knows nor has reason to know of the existence of a foreign account, he cannot willfully fail to report it on an FBAR form. See *Bedrosian v. United States Dept. of Treasury, IRS*, Case No. 15-cv-5853, 2017 WL 4946433, at *5 (E.D. Pa. Sept. 20, 2017) (accepting a defendant's argument that if he did not know an account existed, he could not be held responsible for failing to report it). This principle follows directly from the "willfulness" requirement. Not only must potential violators of the FBAR reporting requirements know of or be reckless regarding the existence of reporting requirement in the abstract—they must also know or be reckless with regards to whether the reporting requirement applies to them.

Here, Defendant Dadurian has testified at deposition and provided sworn affidavits that state that she first learned of the existence of these accounts and her relationship to them during the course of the audit which began no earlier than May 2010. **[SOMF ¶ 1–2.]** The Government can offer nothing to demonstrate Defendant's knowledge or recklessness with regards to the existence of the accounts before September 2008. On that date, Defendant Dadurian concedes that Janet presented her with papers to sign that—if studied—would have informed Dadurian of her

---

[4] The term "shaded penalties" will be used throughout the rest of this memorandum to denote the shaded accounts in the chart on the previous page.

relationship to Ayaba, Stiftung Lionette, and Shoremont, and prompted her to investigate their accounts. Thus, summary judgment is not appropriate with respect to FBAR penalties related these accounts after September 2008. However, Dadurian's 2007 FBAR was due in *June* of 2008, several months beforehand.

It is not subject to genuine dispute that Defendant Dadurian had no knowledge of the 2007 shaded accounts by the 2007 FBAR Form's June 30, 2008 filing deadline. **[SOMF ¶ 1–2.]** Accordingly, she cannot be penalized for having willfully failed to disclose those accounts in 2007.

    **II.**    **Summary Judgment should be granted in Defendant's favor with respect to the 2010 shaded penalties because it is undisputed that Dadurian disclosed all relevant information about these accounts to qualified legal counsel, who advised her that she did not need to file an FBAR form.**

Reasonable reliance on advice of counsel is a defense to even a non-willful FBAR penalty. "To be sure, IRS regulations provide that a taxpayer's reliance upon the advice of tax professionals may establish reasonable cause for a violation of the tax laws in appropriate circumstances." *Jarnagin v. United States*, 135 Fed. Cl. 368, 378 (2017) (citing 26 C.F.R. § 1.6664-4(c)(2) in an FBAR penalty case). "Reliance on an information return, professional advice, or other facts . . . constitutes reasonable cause and good faith if, under all circumstances, such reliance was reasonable, and the taxpayer acted in good faith." *Id.* § 1.6664-4(b).

Advice in this context includes "any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly." *Id.* § 1.6664-4(c)(2). But "advice does not have to be in any particular form." The advice "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances." *Id.* § 1.6664-4(c)(2)(i). Further, "[t]he advice must not be based on unreasonable factual or legal assumptions." *Id.* § 1.6664-4(c)(2)(ii).

15

Here, it is undisputed that Defendant Dadurian relied upon the advice of Akerman, LLP in deciding not to file an FBAR form for the 2010 calendar year. **[SOMF ¶ 5–6.]** By March of 2011, Dadurian had hired Akerman to advise her during the audit and with respect to her obligations to disclose foreign financial accounts. **[SOMF ¶ 3.]** She fully and accurately described to her attorneys her knowledge of Shoremont, Ayaba, and Siftung Lionette that she gleaned from documents produced by third parties during the audit. And she made herself available to answer any questions they may have had. **[SOMF ¶ 4.]**

Upon so informing her attorneys, they advised her that she did not have an obligation to file an FBAR form disclosing foreign bank accounts for the year 2010. **[SOMF ¶ 5.]** (This form was due on June 30, 2011.) Instead, they concluded that because Daniela had no interest in the accounts and trust structure while her mother was alive, only Georgeta had to file an FBAR form. **[SOMF ¶ 5.]** This advice was reflected in Akerman's March 2011 letter to Revenue Agent Ishmael. There, an Akerman attorney describes Dadurian's relationship to Ayaba and Shoremont, and concludes, "We believe it is clear that Daniela has *no control,* nor ever had any control over, accounts title to Ayaba. Additionally, she possesses no beneficial interst in Ayaba while Georgeta is alive." [Exhibit B to Dadurian Decl.]

Regrettably, this advice was not accurate. By virtue of her power of attorney over her mother, Dadurian had signature authority over the accounts and therefore was required to file an FBAR form reporting this signature authority. The undersigned do not wish to judge Akerman too harshly. This is the first case that we are aware of in which the IRS seeks a willful FBAR penalty against a Taxpayer who merely had signature authority over a foreign account, rather than a direct financial interest. The FBAR rules are complex and arcane, and they were even more so in 2011,

when this advice was rendered, due to the scarcity of illuminating case law. They provided the best advice they could under the circumstances. This is why Dadurian relied upon it.

There is no dispute that Defendant Dadurian relied upon advice of counsel in failing to file an FBAR Form for year 2010. **[SOMF ¶ 3–6.]** Accordingly, she cannot be held to have willfully disregarded the applicable disclosure requirements for that year, and summary judgment should be entered in her favor with respect to the 2010 shaded accounts.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter partial summary judgment in her favor consistent with this Motion.

Dated: May 17, 2019

>
> Respectfully Submitted,
>
> /s/ Jeffrey A. Neiman
> Jeffrey A. Neiman
> Fla. Bar No. 544469
> jneiman@mnrlawfirm.com
> Derick Vollrath
> Fla. Bar No. 126740
> dvollrath@mnrlawfirm.com
> **MARCUS NEIMAN & RASHBAUM LLP**
> 100 Southeast Third Ave
> Suite 805
> Fort Lauderdale, Florida 33315
> Telephone: (305) 400-4269
>
> *Counsel for Daniela Dadurian*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record on the Service List.

> By:   /s/ Derick Vollrath
>            Derick Vollrath