UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA                    CASE NO. 9:18-CV-81276

    Plaintiff,

vs.

DANIELA DADURIAN,

    Defendant.
_____/

**DEFENDANT'S REPLY RE MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Daniela Dadurian files this Reply in further support of her Motion for Partial Summary Judgment under Federal Rule of Civil Procedure 56(a).

There are two questions for the Court to answer in resolving Defendant's Motion for Partial Summary Judgment:

> **First:** Has the Government put forth evidence of a genuine dispute of material fact that—on or before June 30, 2008—Defendant Daniela Dadurian did not know[1] that she had an interest in or control over accounts held by Stiftung Lionette, Ayaba, Inc., and Shoremont Resources Ltd. ("The Trust Structure Accounts")?
>
> **Second:** Has the Government put forth evidence of a genuine dispute of material fact that—on or before June 30, 2011—Daniela had disclosed her knowledge of her relationship to the Trust Structure Accounts to her attorneys at Akerman LLP and followed their advice in declining to file an FBAR form?

If the answer to the first question is "No," then Daniela cannot have willfully failed to file an FBAR form disclosing The Trust Structure Accounts for Tax Year 2007. If the answer to the second question is "No,' then Daniela cannot have willfully failed to file an FBAR form disclosing The Trust Structure Accounts for Tax Year 2010. Accordingly, she would be entitled to summary judgment in her favor on the penalties related to these accounts and tax years.

In answering these questions, the Court should bear in mind that a "genuine dispute of material fact" under Rule 56(a) is more than "some metaphysical doubt as to the material facts." *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009). Rather, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Calrett*, 477 U.S. 317, 322 (1986)).

This Reply will address the Government's efforts to identify evidence that creates a genuine issue of material fact with respect to each of these questions in turn and will show why those efforts are wanting.

### I. No genuine issue of material fact exists regarding Daniela's lack of knowledge of the Trust Structure Accounts prior to June 30, 2008.

In her affidavit and at her deposition, Daniela has sworn that she had no knowledge of the Trust Structure Accounts until after the audit underlying this case began in May 2010—and that she certainly had no knowledge of the Trust Structure Accounts on or before June 30, 2008. The

---

[1] Or, arguably, was not reckless in failing to know. [See discussion at DE 26 at 9–12.]

1

Government contests this assertion and points to six items of evidence that it alleges create a genuine issue of material fact for a factfinder to resolve.

The Government is wrong. Its response brief either misunderstands the substance of the evidence it points to or asks the Court to take unreasonable inferences from that evidence. This subsection will address each of the Government's proffered items in turn.

*First*, the Government states that it is inherently implausible that Daniela's father, Aram Dadurian, would have died in October 2001 having "only told a friend named Janet Brookes in St. Kitts" about the Trust Structure and related accounts. [DE 30 at 12.] But this is not what Daniela contends at all. Rather, she acknowledges that **her mother, Georgeta Dadurian**, was involved with creating the Trust Structure and probably even aware of the specific bank accounts involved. Georgeta set up Stiftung Lionette with Aram when Daniela was a secondary school student living abroad. Georgeta was the Trust Structure's primary beneficiary. Daniela will only become the formal beneficiary of the Trust Structure upon Georgeta's death and Georgeta remains alive to this day.

However, it is not disputed that Georgeta developed Alzheimer's Disease shortly after Aram's death, and was formally diagnosed around 2003. Contrary to the Government's representations, it is quite plausible that Aram decided not to inform Daniela that she was the secondary beneficiary of the Trust Structure (to encourage her to go to medical school and work and make her own way) and instead rely on his wife to inform Daniela of the Trust Structure at an appropriate time. This plan was foiled, however, by a horrible, memory-robbing disease.

*Second*, the Government points to a 2005 Divorce Decree that states that Daniela is entitled to retain "all assets inherited from her father . . . regardless of how said assets may be titled." [DE 30 at 13; DE 34 at ¶¶ 1 & 43.] The Government argues that this refers to the Trust Structure Accounts and creates an inference of Daniela's awareness of them. But, again, the Government misunderstands the document and the Government's suggested inference is not reasonable.

Language referencing assets "regardless of how said assets may be titled" is common in the family law context. *See, e.g.*, *Salkini v. Salkini*, 2017 WL 1248024 (Md. Ct. App. 2017) (observing that Maryland's Marital Property Act recognizes that a spouse may have an interest in property "regardless of how that property may be titled.") Ordinarily, it is used to refer to assets purchased with a divorcing partner's funds, even though the assets' title may not reflect how those assets were purchased. For example, a jointly titled property may have been purchased with a

2

spouse's separate funds, or a property in the name of only one spouse may have been purchased with marital assets.

But even if this phrase is not family law boilerplate, scrutiny of the Divorce Decree itself reveals that it does not refer to the Trust Structure Accounts. A copy of the Divorce Decree is attached as Exhibit 4 to the Government's Revised statement of Material Facts. [DE 34.] In its entirety, the quoted portion of the document states as follows:

> **OTHER ASSETS TO BE RETAINED BY THE WIFE.** The Wife owned numerous assets when the parties married. Except as otherwise stated herein to the contrary, the Wife shall retain sole ownership and possession of all assets which she owns individually or the parties own jointly or owns jointly with anyone other than the Husband, including but not limited to all residences and assets located within or outside of the United States, all assets inherited from her father, including any appreciation or growth in the same (passive or active) regardless of how said assets may be titled, all assets listed on her financial statement attached to the parties' Prenuptial Agreement, including any appreciation or growth in the same (passive or active) as well as any assets subsequently purchased with the proceeds from the sale of any of those assets, any bank or brokerage accounts in which she has an interest, the Mara Lago Club membership, and any other asset in which she or the parties own an interest.

[DE 34-4 at 20.]

Daniela testified at deposition that the only thing she inherited from her father was a property in St. Kitts, and that there was possibly another property for which her father's friend, confidante, and property manager, Janet Brookes "could never really give [Daniela] an exact answer what happened to that house." [DE 34-2 at 12:22–13:25.] Janet had the responsibility of selling Aram's St. Kitts Property after he died. [DE 34-2 at 14:11–15:22.] But Janet never properly accounted to the Daniela or Georgeta for the funds received from the sale of those properties. [DE 34-2 at 14:11–14:22.]

In context, then, it is apparent that this divorce decree refers to *these properties* and their proceeds, not the Trust Structure, still unknown to Daniela. Finally, Daniela reminds the Court that the Government bears the burden of proof. The Government could have deposed Daniela's ex-husband and others to determine what this language meant. But they have not done so. Even taking all reasonable inferences from this evidence in the light most favorable to the Government, no jury

could conclude from this Divorce Decree that Daniela knew of the Trust Structure Accounts in 2005.

*Third*, along the same lines, the Government refers to a "termination letter" that Daniela wrote Janet Brookes in March 2009, in which she acknowledged Brookes's "stewardship of my property and assets entrusted to you from the year 2001 when my father passed away." [DE 30 at 14; DE 34 at ¶ 1 & 45.] The Government takes the position that "[t]his admission supports an inference that Daniela understood that Brookes was managing for Dadurian's benefit the foreign accounts established by her father during his lifetime."

But such an inference from this document would be unreasonable. Again, this document refers to the aforementioned real property in St. Kitts (and the proceeds from the sale of that real property). This is apparent from scrutiny of the documents, which are attached to the Government's Revised Statement of Material Facts as Exhibit 5. These documents include a demand for a full accounting of money that Brookes spent and held for Daniela. [DE 34-5 at 1.] And as a result of this communication, Daniela and Brookes stipulated that Janet held only $273,300 dollars for Daniela. [DE 34-5 at 3.] Of course, as the Government acknowledges, the Trust Structure Accounts held about $1.5 million as of the date of this stipulation. The only fair inference from this stipulation is that Daniela *was not aware* of the Trust Structure Accounts Brookes managed. Otherwise, she would not have stipulated that Brookes managed only $273,300.[2]

In any event, there is no evidence to support an inference that this letter refers to the Trust Structure Accounts.

*Fourth*, the Government states that "Daniela authorized the transfer of funds from Shoremont to Ayaba after that entity [Ayaba] was created in 2006 for the purpose of funding the $1.189 million dollar purchase in 2007 of the real property in which she operates her medical practice." [DE 30 at 13; DE 34 at ¶ 22–25.] This, the Government contends, "creates an inference that she knew or should have known that she and her mother had an interest in or authority over the accounts." [DE 30 at 13–14.]

But, again, the Government misconstrues the evidence it cites. Daniela acknowledges that she approached Janet Brookes in 2007 for a loan, which was arranged through a company named

---

[2] Daniela would later sue Janet and obtain a consent judgment against her. A copy of this consent judgment is attached to this Reply as "Exhibit 1."

Ayaba, Inc. This loan is memorialized in a promissory note and loan agreement attached to the Government's Revised Statement of Material Facts as Exhibit 25. [DE 34-25.] The loan agreement is dated September 18, 2007. Evidence in the record supports the proposition that *Brookes* (not Daniela) caused funds to be transferred from Shoremont to Ayaba to facilitate this loan. There is no evidence *Daniela* knew of Shoremont or the rest of the Trust Structure and Ayaba's relationship to it at this time. In fact, it was not until *September of 2008*—well after her June 30, 2008 FBAR due date—that Brookes presented Daniela with documents referencing the Trust Structure that retroactively authorized the transfer of funds from Shoremont to Ayaba. Daniela discussed these facts in her motion, and that is why she has not moved for summary judgment with respect to the Trust Structure Accounts for Tax Years 2008 and 2009. [*See* DE 26 at 5.] But these facts do not bear on her knowledge of the Trust Structure Accounts for Tax Year 2007.

*Fifth*, the Government argues that a jury could infer Daniela's knowledge of the Trust Structure Accounts from supposed evidence of "her guilty conscience." [DE 30 at 14.] Specifically, the Government states that Daniela "acted to conceal the offshore transfer of funds to her medical practice from her accountant by falsely stating to him that the source of the funds to purchase her medical office building was a loan from Seaside Bank—not from Ayaba as she later claimed." [DE 30 at 14; DE 34 at ¶2.]

But there is actually *no evidence* that Daniela used the Seaside Bank loan to conceal Ayaba. Daniela *did* fund a portion of the property using funds from Seaside Bank. Daniela provided her CPA, Tony Caruso, with all documentation related to this transaction. None of it was altered in any way to conceal another payment source (for example, by inflating the size of the Seaside Bank loan to cover the amount funded through Ayaba).[3] Further, a receipt generated by the closing agent for the transaction (the law firm of Bilzen Sumberg) reflects that Daniela made no effort to conceal Ayaba from it. A copy of this receipt is attached to this Reply as "Exhibit 2." A reasonable factfinder accordingly could not infer from this that Daniela (1) intended to conceal Ayaba from her CPA and (2) that she did so because she knew that she had a reportable relationship to the Trust Structure Accounts.

---

[3] Moreover, Daniela testified that no money was drawn upon the Ayaba loan until late 2008, after the June 30, 2008 FBAR deadline for 2007. [*See* DE 26 at 5; DE 26-2 at ¶26.] Accordingly, until this time there would have been nothing to disclose to her CPA.

5

*Finally*, the Government makes its "most notable' argument: that Daniela "failed to report the existence of her own foreign bank account and her mother's accounts that she controlled and used to pay her mother's bills—both accounts of which she was aware." [DE 30 at 14.] Specifically, the Government states that "Daniela Dadurian maintained a personal bank account at Frankfurter Bank in Switzerland" and failed to so inform her accountant. [DE 34 at ¶47.] Further, "Dadurian was aware in 2007 that her mother had a German Bank account at Sparkasse Bodensee" but failed to disclose it to her accountant. [DE 34 at ¶52.]

This is perhaps the Government's most egregious misreading of the record. The uncontroverted evidence is that Daniela **did, in fact, disclose these accounts to her CPA on or before 2007**. In response to an IRS Information Document Request made in the underlying audit, Daniela's CPA Tony Caruso provided his workpapers. These workpapers contain handwritten notes reflecting that Mr. Caruso was aware of a Berlin pension belonging to Georgeta. These Notes are attached to this Reply as "Exhibit 3." CPA Caruso testified about this document at his deposition. [*See* 34-11 at 177:4–180:6.] He states that, although he received statements for Daniela's American bank accounts, "whatever paperwork come from Germany was in German and Dr. [Daniela] Dadurian translated it so I can pick up the numbers for the tax returns." [DE 34-11 at 178:14–178:17.] Further, he testified that he "could have" (he doesn't quite remember) actually seen copies of the German account statements pertaining to the Sparkasse Bodensee account as early as 2004. [DE 34-11 at 179:22–180:5.] Additionally, Caruso clearly testified that Daniela' LB Swiss account (LB Swiss would later change its name to Frankfurter Bank, the entity name used in the Government's complaint) was present on the books of Daniela's medical practice and that he was aware of it. [DE 34-11 at 96:19–21.]

Despite this, Caruso did not advise Daniela to file an FBAR form and prepared tax returns reflecting that she did not have a reportable interest in or relationship to a foreign bank account on her Schedule Bs. The Government's arguments on this score appear to be based on a misreading of the factual record.

Daniela did not know of—and was not reckless in failing to know of—the Trust Structure Accounts by the June 30, 2008 deadline for the filing of her 2007 FBAR form. On this, no genuine issue of material fact exists. The Government's efforts to create one fail, as they rely on unreasonable inferences from misunderstood facts, and do not raise more than a "metaphysical doubt" on the issue.

6

> II. **No genuine issue of material fact exists regarding Daniela's disclosure of the Trust Structure Accounts to her Akerman LLP attorneys before June 30, 2011, and her reliance upon their advice that she had no FBAR filing obligation.**

In her affidavit and at her deposition, Daniela has given sworn testimony that before June 30, 2011, she fully disclosed her relationship to the Trust Structure Accounts to her attorneys at Akerman, LLP, a prominent national law firm, and answered any further questions they may have had. [DE 26-1 at ¶4.] She states that she discovered this information during the course of the IRS's audit underlying these fines, which began in May of 2010, by reviewing with her attorneys the documents that the Government procured from the foreign banks at issue. Daniela has testified that she relied upon these attorneys' advice that she had no obligation to file an FBAR form for Tax Year 2010, which would have been due on June 30, 2011. [DE 26-1 at ¶5–6.] Accordingly, she cannot be held responsible for *willfully* failing to file the form.

> A. *Reliance on Advice of Counsel negates Willfulness, and therefore is a defense to a willful FBAR claim.*

The Government has responded by arguing that reliance on counsel is not a defense to a claim for willful failure to file an FBAR form. [DE 30 at 10.] But this argument is wrong. Rather, reliance upon counsel *is* a defense to a willful FBAR penalty because it negates the element of willfulness. Only one court appears to have expressly addressed this matter in the FBAR context. In *United States v. Flume*, Case No. 5:16-cv-73, 2018 WL 4378161 (S.D. Tex. Aug. 22, 2018), the court held as follows:

> Indeed, Flume testified that he relied on his tax preparer's competence in preparing the return. If he did, then it is not "so obvious" that he took an 'unjustifiably high risk' in doing so. The warning to "[s]ee instructions for . . . . Filing requirement for form TD F 90-22.1" also says that there are "exceptions" to the duty to file an FBAR. Flume might understandably have reasoned that he did not have to file an FBAR because his preparer had determined that one of those exceptions applied.

*Id.*, at *9. Outside the FBAR context, the Southern District of Florida has confirmed that an "advice of counsel" defense negates the willfulness element in a civil claim. *Brown v. Toscano*, 630 F. Supp. 1342, 1349–50 (S.D. Fla. 2008). And the Eleventh Circuit has regularly affirmed that "advice of counsel" may be relied upon "to negate the willfulness element" of a criminal charge. *See United States v. Brown*, 983 F.2d 201, 203 (11th Cir. 1993); *United States v. Harrison*, 635 F. App'x 608, 610 (11th Cir. Dec. 2, 2015).

7

Indeed, rather than address reliance on counsel, specifically, the Government argues that the defense of "*reasonable cause*" does not apply to a willful FBAR violation. In this, the Government is correct. But "reasonable cause" in the FBAR context is generally understood to mean "ordinary business care and prudence." *Jarnagin v. United States*, 134 Fed. Cl. 368, 376–77 (2017). The purpose of eliminating this defense in the willfulness context is likely to prevent a jury from declining to assess a willfulness penalty if it concludes that, all things considered, willfully failing to file the FBAR form was a strategic, calculated, and "prudent" choice of the defendant. And while a defendant to a non-willful FBAR claim can argue that his reliance on counsel rises to the level of reasonable cause, that is neither the only way to show reasonable cause nor the only way to employ an advice of counsel "defense." As set forth in *Flume*, a taxpayer's reliance on advice of counsel can negate the Government's prima facia case by negating willfulness in a willful FBAR penalty matter. 2018 WL 4378161, at *9.

> B.   The Government has raised no genuine dispute that Daniela relied upon advice of counsel in failing to file her 2010 FBAR, due June 30, 2011.

To counter Daniela's testimony and affidavit, the Government makes three observations. None of them create a genuine issue of material fact as to Daniela's reliance on counsel. Each argument will be addressed in turn.

*First*, the Government argues that "there is evidence that [Daniela] was advised by her accountant Anthony Caruso to file an FBAR for year 2010." [DE 30 at 15; DE 34 at ¶67.] The Government's use of the vague reference "*an* FBAR" is telling. The draft FBAR, and Caruso's accompanying letter, is attached as Exhibit 12 to the Government's Revised Statement of Material Facts. It clearly reflects that the draft 2010 FBAR at issue was prepared **"for Georgeta,"** not for Daniela. [DE 34-12 at 1.] The accompanying draft FBAR form also reflects in Box 7 that Georgeta is the filer.

A brief explanation of FBAR filing obligations is appropriate to understand what this means. An individual must file an FBAR form if she has *either* (1) a financial interest in; or (2) control over certain foreign accounts. If one has a financial interest in an account, that account must be listed on Part II of the FBAR form. If one has only control over an account, then that account must be listed on Part IV of the FBAR form.

Even taking all reasonable inferences from the facts in the light most favorable to the Government, Caruso concludes only that **Georgeta** must file a 2010 FBAR disclosing her financial interest in the accounts on Part II of the form. He so concludes even though—per his accompanying

8

letter—Daniela has informed him that she has power of attorney over Georgeta at the time. **Importantly, Caruso does not conclude that Daniela must file a 2010 FBAR disclosing her signature authority over the accounts, in Part IV**.

But, it is this failure—concerning *Daniela's* FBAR filing obligations—that is at issue in this case. The IRS closed the audit in this case after accepting (1) late-filed FBARs that reflected that from 2007–2010, Georgeta had a financial interest in the accounts (on Part II of the form) as the beneficiary of the Trust Structure until her death; and (2) late-filed FBARs that reflected that Daniela had control over the accounts (on Part IV of the form) by virtue of her power of attorney over her mother. (Copies of Daniela's late-filed FBAR forms are attached to the Government's Revised Statements of Material Facts as Exhibits 6–9.) Further, all tax related to income generated by the Trust Structure Accounts was assigned to Georgeta's 1040 tax return and not Daniela's.

The IRS then assessed penalties against *Daniela* for her alleged willful failure to comply with *her* FBAR filing obligations. But they assessed no penalties for any failure to comply with *Georgeta's* FBAR filing obligation. This process included the mailing of notices and formal assessment that are necessary precedents to suit in district court. It is these penalties—and not any penalty involving Georgeta's FBAR forms—that this case concerns and the Complaint describes. [*See, e.g.*, DE 1 at ¶46.]

Accordingly, contrary to the Government's argument in its Response, Caruso's failure to advise **Daniela** to file a 2010 FBAR disclosing her **signature authority** on Part IV of the form **bolsters rather than undermines** Daniela's testimony that she relied on advice of counsel. Caruso's actions in this matter are entirely consistent with her Akerman attorneys' position that Daniela had no reportable interest in the accounts and, instead, "it is clear that Daniela has no control over, nor ever had any control over accounts titled to Ayaba [and a]dditionally, she possesses no beneficial interest in Ayaba while Georgeta is alive." [DE 34-3 at 3.]

<u>Second</u>, the Government argues that Daniela's "bald statement that she provided her attorneys with sufficient information to determine whether an FBAR was required is insufficient to support a reasonable cause defense." [DE 30 at 15.] The Government cites to no law in support of this proposition. And, again, it misreads the record. Daniela does not assert her reliance upon advice of counsel as part of a reasonable cause defense, but instead does so to negate the element of willfulness in the Government's prima facia case.

9

Regardless, the Government misinterprets Daniela's testimony. Daniela testified not only that she made full disclosure of her relationship to the accounts. She testified that she answered whatever follow-up questions her attorneys may have had. A client, especially concerning complex tax matters, is entitled to rely on counsel to identify the salient facts and issues and ask the right questions. Moreover, there is evidence of what Daniela told her advisors. The substance of Daniela's disclosure is approximated in her attorney's letter to the IRS, attached as Exhibit 3 to the Government's Revised Statement of Material Facts. This letter accurately describes the circumstances of this case and, indeed, mirrors the Government's Complaint on this score. Thus, Daniela testifies to much more than the "bald statement" referenced by the Government. Finally, the Government bears the burden of proof on willfulness, and accordingly any lack of evidence on this issue should not be held against Daniela in any event.

*Finally*, the Government states "[i]t is undisputed that Dadurian filed FBARs reporting foreign accounts in 1993 and 1996" and that this "creates an inference that she knew or should have known of her obligation to do so in 2010 as well." [DE 30 at 15.] But this argument is not well founded. This Motion does not turn on whether Daniela knew of FBARs or was aware that—in some circumstances—an FBAR must be filed. Rather, the Motion turns on (1) whether Daniela was aware of *the existence* of the Trust Structure Accounts in before June 30, 2008; and (2) whether Daniela understood that she had to file an FBAR disclosing accounts in which *someone over whom she had power of attorney* had a beneficial interest. Daniela's 1993 and 1996 FBARs are attached to this memorandum as "Exhibit 4." Daneila's 1993 and 1996 FBAR (which have a checkbox rather than separate parts to indicate the filer's relationship to the accounts) concern disclosure of accounts that Dadurian had a financial interest in at the time (none of which, of course, are the Trust Structure Accounts at issue here). Her filing of these FBAR forms in 1993 and 1996 accordingly do not speak to her understanding of her obligation to file an FBAR form containing a Part IV disclosure concerning accounts that she controls through power of attorney over another.

## CONCLUSION

The Government has shown no genuine issue exists as to the following facts: (1) Daniela did not know of the Trust Structure Accounts before June 30, 2008 and this failure was not due to recklessness; and (2) Daniela relied upon advice of counsel in failing to file her 2010 FBAR form. Accordingly, the partial summary judgment in her favor and against the Government on the following penalties identified in her Motion.

Dated: June 10, 2019

>Respectfully Submitted,
>
>/s/ Jeffrey A. Neiman
>Jeffrey A. Neiman
>Fla. Bar No. 544469
>jneiman@mnrlawfirm.com
>Derick Vollrath
>Fla. Bar No. 126740
>dvollrath@mnrlawfirm.com
>**MARCUS NEIMAN & RASHBAUM LLP**
>100 Southeast Third Ave
>Suite 805
>Fort Lauderdale, Florida 33315
>Telephone: (305) 400-4269
>
>*Counsel for Daniela Dadurian*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2019, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record on the Service List.

>By:   /s/ Derick Vollrath
>          Derick Vollrath